IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL BAISDEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:08-CV-00451 |
| | § | |
| I'M READY PRODUCTIONS, INC., | § | |
| IMAGE ENTERTAINMENT, INC., and | § | |
| A.L.W. ENTERTAINMENT, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION

Pending before the court are Plaintiff's First Amended Motion to Exclude Testimony of Karl Weisheit ("Weisheit")(Docket Entry No. 178) and Plaintiff's Motion to Exclude Testimony of Kathryn Arnold ("Arnold")(Docket Entry No. 195).   The court has considered the motions, the responsive briefs thereto, Plaintiff's reply brief to Defendants' response to the Weisheit motion, the expert reports, and the applicable law.  For the reasons explained below, the court **GRANTS IN PART AND DENIES IN PART** both of Plaintiff's motions.

### I.  Case Background

This action deals with two books authored by Plaintiff, The Maintenance Man and Men Cry in the Dark, that were adapted into live performance plays (hereinafter, "Maintenance Man Stageplay" and "Men Cry Stageplay" or collectively "stageplays") by I'm Ready Productions, Inc., ("IRP").  Plaintiff and IRP entered contracts for both stageplays (hereinafter, "Maintenance Man Agreement" and

"Men Cry Agreement" or collectively "Stageplay Agreements").  The Stageplay Agreements governed Plaintiff and IRP's relationship with regard to the sharing of profits, copyright ownership, and other issues.  Plaintiff brought claims under federal copyright law and state common law.

The factual details leading to this lawsuit have been repeated many times in the record[1] and need not be reviewed here.  Of more significance to the pending motions is the post-filing procedural history and the current complexion of the case.

On February 7, 2008, Plaintiff filed a lawsuit against Defendants for multiple claims related to their alleged violations of Plaintiff's intellectual property and contract rights related solely to the Maintenance Man Agreement and source novel.[2]  Image Entertainment, Inc., ("Image") filed a crossclaim for indemnification against IRP, and IRP filed a multifaceted counterclaim against Plaintiff.[3]  Subsequently, Image dropped its crossclaim.[4]

Plaintiff amended his complaint twice in 2008, adding claims concerning Men Cry in the Dark for the first time in his second

_____

[1]      See, e.g., Mem. & Recommendation dated Sept. 9, 2009, Docket Entry No. 126, pp. 2-15.

[2]      See Pl.'s Compl. for Damages and Injunctive Relief, Docket Entry No. 1.

[3]      See Image's Original Answer & Crosscl., Docket Entry No. 12; IRP's Original Answer & Countercl., Docket Entry No. 24.

[4]      See Joint Stipulation of Dismissal of Crosscl., Docket Entry No. 26.

2

amended complaint on November 4, 2008.[5]  At that point in the
lawsuit, Plaintiff's claims were copyright infringement, unfair
competition by misappropriation, civil conspiracy, breach of
contract related to the stageplay contracts, and tortious
interference with business relations.[6]  Plaintiff sought as damages
a permanent injunction ending "Defendants' copyright infringement,
unfair competition, . . . breach of contract[,] and . . . further
use of the Plaintiff's Novels," infringement damages based on
profits or statutory amounts, treble damages for willful
infringement, a statement of compliance with the injunction, an
equitable accounting, damages related to the other causes of action
including profits resulting from unfair competition, pre- and post-
judgment interest, costs, and attorney fees.[7]

    IRP and Image joined forces in answering Plaintiff's first
amended complaint, and A.L.W. Entertainment, Inc., ("ALW") joined
IRP and Image in answering Plaintiff's second amendment.[8]  The
claims raised by Defendants in their counterclaim to Plaintiff's
second amendment, which were similar to those asserted in IRP's

---

[5]    See Pl.'s First Am. Compl. for Damages & Injunctive Relief, Docket
Entry No. 25; Pl.'s Second Am. Compl. for Damages & Injunctive Relief, Docket
Entry No. 62.

[6]    Pl.'s Second Am. Compl. for Damages & Injunctive Relief, Docket Entry
No. 62, pp. 7-11.

[7]    Id. at pp. 11-13.

[8]    See IRP and Image's Answer to Pl.'s First Am. Compl., Docket Entry
No. 29; Defs.' Answer to Pl.'s Second Am. Compl., Affirmative Defenses, and
Countercl., Docket Entry No. 66.

original counterclaim, were breach of contract for the Stageplay Agreements, quantum meruit, tortious interference with an existing contract, and tortious interference with prospective business relations.[9]  With regard to Maintenance Man Agreement, Defendants alleged that the parties had entered a second agreement in December 2002 that supplanted a prior agreement that was executed in July 2002.[10]

Defendants also requested declarations that:  1) the December 2002 Maintenance Man Agreement is valid and enforceable; 2) IRP is entitled to a minimum of $300,000 under the December 2002 Maintenance Man Agreement related to motion picture rights; 3) IRP is the sole copyright owner of the stageplays; or, alternatively, 4) IRP possessed a nonexclusive license to distribute videos of the stageplays; and 5) IRP had the right under the Stageplay Agreements to sell the videos.[11]  IRP sought an accounting of Plaintiff's sales, actual damages, punitive damages, attorneys' fees, and costs.[12]

Upon consideration of Defendants' motion for partial summary judgment in September 2009, the court narrowed Plaintiff's claims to:  1) copyright infringement for sales of the Maintenance Man

---

[9]    See Defs.' Answer to Pl.'s Second Am. Compl., Affirmative Defenses, and Countercl., Docket Entry No. 66, pp. 18-25.

[10]    Id. at pp. 11-12.

[11]    Id. at pp. 18-19.

[12]    See id. at pp. 26-27.

4

Stageplay video recordings on or after July 25, 2005, (or December 29, 2005, depending on a factual determination related to whether the alleged December 2002 Maintenance Man Agreement was valid); 2) copyright infringement for the Men Cry Stageplay live performances and sales of video recordings on and after November 4, 2005; 3) breach of contract for the Maintenance Man Stageplay video recordings sold after February 7, 2004.[13]  Defendants did not file for summary judgment on Plaintiff's unfair competition and civil conspiracy claims; thus, those claims remain in the lawsuit as well.[14]

At the same time, the court considered Defendants' arguments in favor of declarations that:  1) the Maintenance Man Agreement dated December 2002 is valid and enforceable; 2) IRP possesses all rights to the stageplays; 3) Plaintiff owes IRP $300,000 in connection with the Screen Gems contract for movie rights on <u>The Maintenance Man</u>.[15]  The court denied summary judgment on all of Defendants' declaratory requests finding that fact issues precluded the first and third requests and that copyright law did not support the second request.[16]  Defendants also sought favorable judgment on

---

[13]     <u>See</u> Mem. & Recommendation dated Sept. 9, 2009, Docket Entry No. 126, pp. 19-45.  The court adopted this Memorandum and Recommendation without change. <u>See</u> Order dated Nov. 23, 2009, Docket Entry No. 149.

[14]     <u>See</u> Mem. & Recommendation dated Sept. 9, 2009, Docket Entry No. 126, p. 45.

[15]     <u>See</u> <u>id.</u> at pp. 19-45.

[16]     <u>See</u> <u>id.</u> at pp. 22, 37-39, 44.

their tortious interference claim.[17]   The court not only denied
Defendants' motion for judgment in their favor but sua sponte
granted judgment in favor of Plaintiff on the claim.[18]

In November 2009, Plaintiff filed a motion for leave to add
new parties, which the court granted in part and denied in part.[19]
The court allowed Plaintiff to add Johnson and Guidry as parties
only to the extent of allegations of vicarious liability for the
claims against IRP that survived summary judgment.[20]   Defendants
answered the third amended complaint in order to add Johnson and
Guidry's affirmative defenses.[21]   Although the most recent round of
pleadings included claims on which the court previously granted
summary judgment, the live claims are only those listed above as
surviving summary judgment.

On the issue of damages, the parties retained experts.
Plaintiff hired Scott A. Barnes ("Barnes"), a certified public
accountant, who estimated for the first time in a supplemental
report that, as a result of Defendants' actions, Plaintiff lost
over thirteen million dollars in film development opportunity based

---

[17]   See id. at p. 19.

[18]   See id. at pp. 43-44.

[19]   See Mot. for Leave to File Plaintiff's Third Am. Complaint, Docket
Entry No. 142; Order dated Dec. 3, 2009, Docket Entry No. 152.

[20]   Order dated Dec. 3, 2009, Docket Entry No. 152.

[21]   See Defs.' Answer to Pl.'s Third Am. Compl., Affirmative Defenses,
and Countercl., Docket Entry No. 155.

on his novels and Defendants realized over one million dollars in profits from the sale of stageplay merchandise and video recordings.[22] He also opined that the revenue from the merchandise sales significantly exceeded the amounts disclosed by Defendants.[23]

In a previous order, the court found the bulk of Barnes' opinions to be based largely on speculation and/or irrelevant.[24] Specifically, the court limited the actual damages calculation to lost profits from the production of one movie based on The Maintenance Man.  The court did not limit Barnes' testimony regarding profits Defendants realized from the sale of stageplay merchandise and video recordings.  With regard to the proper method of calculation under the Copyright Act, the court noted that Barnes' focus on Plaintiff's lost film development opportunity, rather than on the injury to the fair market value of the copyrighted work, is allowable but subject to cross-examination.

**C.  Defendants' Experts and Testimony**

Both of the experts' opinions challenged by Plaintiff in the pending motions are responsive to Barnes' opinions on economic damages.

**1.  Weisheit's Testimony**

---

[22]   See Defs.' Second Sealed Expert App., Docket Entry No. 184, Sealed App. 1, Supplemental Expert Report of Barnes dated Dec. 24, 2009, pp. 3-5.

[23]   See id. at pp. 4-5, Attach. 21, Analysis of IRP Merchandise Sales Recorded in General Ledger.

[24]   See Mem. Op. dated May 7, 2010, Docket Entry No. 193, pp. 12-18.

Weisheit is certified public accountant with more than twenty years of experience in accounting and approximately ten years of experience in forensic accounting, litigation consultation, and financial damages calculation.[25]   His experience covers a wide variety of industries, including entertainment and intellectual property.[26]

Weisheit's report is directly responsive to Barnes' supplemental report.[27]   Based on his review of the evidence, Weisheit found that the opportunity for film development "does not appear" to "have expired, been cancelled or ceased" and, thus, opined that "the only appropriate damages in this case could be DELAY DAMAGES if it is determined that actions of the Defendants delayed the making of one or more motion pictures."[28]   Although an appropriate measure, delay damages are not appropriate in this case, according to Weisheit, because Plaintiff has failed to establish a causal connection between Defendants' actions and the delay of film production.[29]

A review of the relevant agreements, Weisheit wrote, revealed

---

[25]     Defs.' Sealed App. in Support of Defs.' Resp. to Pl.'s First Am. Mot. to Exclude Testimony of Weisheit ("Defs.' Second Sealed Expert App."), Docket Entry No. 184, Sealed App. 116, Expert Report of Weisheit dated Feb. 15, 2010, Attach. 1, Weisheit's Curriculum Vitae.

[26]     Id.

[27]     See Defs.' Second Sealed Expert App., Docket Entry No. 184, Sealed App. 116, Expert Report of Weisheit dated Feb. 15, 2010, p. 1.

[28]     Id. at pp. 2, 5.

[29]     Id. at pp. 5-6.

that Plaintiff was neither a party to the option agreement for the movie rights for the books The Maintenance Man: Sometimes Women Need A Little Fix and The Maintenance Man: It's Midnight Do You Know Where Your Woman Is? nor a member of the Farcor Baisden Partnership, LLC.[30]  Weisheit further supported his assessment by noting that, although Plaintiff's services were contemplated by additional agreements on writing and producing, he was not a party to those contracts either.[31]

Despite his opinion that no damages were warranted, Weisheit calculated delay damages for an initial movie based on The Maintenance Man as between $12,956 and $28,419 for a one-year delay and between $25,262 and 55,414 for a two-year delay.[32]  Weisheit took issue with Barnes' assumption that the movie(s) would generate net proceeds and with the speculative nature of Barnes' movie development damages calculation.[33]

With regard to apportionment of profits from merchandise sales, Weisheit found that Barnes failed to address the issue at all.[34]  Weisheit concluded that Plaintiff would be entitled to no

---

[30]    Id. at p. 7.

[31]    Id.

[32]    Id. at p. 10.  Weisheit also calculated delay damages for the other four prospective movie deals, the availability of which the court already has ruled out.  Id.; Mem. Op., Docket Entry No. 193, pp. 12-18.

[33]    See Defs.' Second Sealed Expert App., Docket Entry No. 184, Sealed App. 116, Expert Report of Weisheit dated Feb. 15, 2010, pp. 11-13.

[34]    Id. at p. 13.

more than forty percent of the net profits from merchandise sales.[35]

### 2. Arnold's Testimony

Arnold is "an award winning film producer and executive with over twenty years of experience in film production, acquisition, distribution, international sales, and film financing."[36]  Arnold declared that her experience included "script development, casting, packaging, and contract negotiation" and that she has worked with "talent agents, production crew, distribution executives, investors, and lawyers in the development, production, and distribution of feature film projects."[37]  As a consultant and expert witness, Arnold has advised on matters related to entertainment industry practices and standards, economic forecasting, and intellectual property rights, among other areas.[38]

Arnold's primary mission in this case was to respond to Barnes' supplemental opinion regarding damages for the lost opportunity of film development.[39]  Her report focuses on damages

---

[35]    Id. at p. 15.

[36]    Defs.' Resp. in Opp'n to Pl.'s Mot. to Exclude Testimony of Arnold, Docket Entry No. 200, Ex. A, Decl. of Arnold, ¶ 2; see also id. at Ex. A-1, Arnold's Expert Report, p. 2.

[37]    Defs.' Resp. in Opp'n to Pl.'s Mot. to Exclude Testimony of Arnold, Docket Entry No. 200, Ex. A, Decl. of Arnold, ¶ 2; see also id. at Ex. A-1, Arnold's Expert Report, p. 2.

[38]    Defs.' Resp. in Opp'n to Pl.'s Mot. to Exclude Testimony of Arnold, Docket Entry No. 200, Ex. A, Decl. of Arnold, ¶ 3, Ex. A-1, Arnold's Expert Report, p. 2.

[39]    See Defs.' Resp. in Opp'n to Pl.'s Mot. to Exclude Testimony of Arnold, Docket Entry No. 200, Ex. A, Decl. of Arnold, ¶ 4.

related to the copyright infringement claim.[40]  Arnold concluded "that the alleged copyright infringement by Defendants was not an impediment for any film adaptation or features films [sic] to be produced based upon Plaintiff's novels, and any economic damages related to alleged infringement are not supported."[41]  Arnold opined that the option contract made no guarantee of film production of one movie based on <u>The Maintenance Man</u>, much less a sequel or other movies based on Plaintiff's novels.[42]

Like Weisheit, Arnold articulated concerns that Barnes' testimony was speculative and was based on the unsupported assumption that the option agreement had expired or had been cancelled.[43]  Additionally, she opined that the sale of video recordings of the stageplays had not and would not impede film development.[44]  Barnes' use of the success of African-American author Tyler Perry's ("Perry") movies as a measure of Plaintiff's economic damages was "not a true competitive analysis based on any empirical data," according to Arnold, because Perry's "stage and film franchises . . . far exceeded the scope of Plaintiff's body of work" and because Perry often is responsible for some or all of the

---

[40]    Defs.' Resp. in Opp'n to Pl.'s Mot. to Exclude Testimony of Arnold, Docket Entry No. 200, Ex. A-1, Arnold's Expert Report, p. 2.

[41]    <u>Id.</u>

[42]    <u>Id.</u> at p. 4.

[43]    <u>Id.</u> at p. 5.

[44]    <u>Id.</u> at p. 6.

11

financing for his projects.[45]

In her opinion, the likelihood that a movie would be produced based solely on the existence of an option contract is "quite low," as that is only the first stage of the development process.[46] Arnold placed the likelihood of <u>The Maintenance Man</u> becoming a movie, despite the extant option agreement, at less than twenty percent.[47]  Attacking the amount of damages projected by Barnes, Arnold stated that Barnes relied on the highest level of the fees range, a release on 900 or more screens domestically, sole writing credit, one-hundred percent producing credit, an unjustified assessment of net proceeds, and a baseless projection of box office gross receipts; all of which were unlikely scenarios under these facts.[48]

## II.  Expert Testimony Legal Standard

The Federal Rules of Evidence and related case law require that an expert be qualified and that the expert's testimony be both reliable and relevant.  <u>See</u> Fed. R. Evid. 702;[49] <u>Kumho Tire Co.</u>

---

[45]    <u>Id.</u> at pp. 6, 8-9.

[46]    <u>Id.</u> at p. 9.

[47]    <u>Id.</u> at p. 10.

[48]    <u>Id.</u> at pp. 10-13, 15.

[49]    Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

v. Carmichael, 526 U.S. 137, 152 (1999); Smith v. Goodyear Tire & Rubber Co., 495 F.3d 224, 227 (5th Cir. 2007).   The burden of establishing this predicate for the expert's testimony naturally falls on the party producing the expert.   Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998).   The trial court determines whether that party has met its burden.   See Fed. R. Evid. 104(a); Moore, 151 F.3d at 276; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 592, 597 (1993).

The expert may be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Testimony that is not scientific in nature is better judged by examining whether the expert has sufficient personal knowledge, work experience, or training to support the opinions offered.   See Fed. R. Evid. 702; Kumho Tire Co., 526 U.S. at 150-51.   In general, the court's responsibility "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152.

Reliability hinges on the sufficiency of the facts or data upon which the opinion is based, the dependability of the principles and methods employed, and the proper application of the principles and methods to the facts of the case.  Fed. R. Evid.

_____

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

13

702; Smith, 495 F.3d at 227.  The expert's methodology must be scientifically grounded and cannot be based on mere conjecture or speculation.  See Daubert, 509 U.S. at 590.  If the opinion is based solely or primarily on experience, the witness must connect the experience to the conclusion offered, must explain why the experience is a sufficient basis for the opinion, and must demonstrate the appropriateness of the application of the experience to the facts.  Fed. R. Evid. 702, Advisory Committee Notes.

To be relevant, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; Daubert, 509 U.S. at 591.  That is, it must have the tendency to make any material fact "more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401; see also Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 352 (5th Cir. 2007)(quoting Daubert, 509 U.S. at 593, as stating that relevance relates to whether the reasoning or methodology is a proper fit with the facts of the case).

The bottom line is:

The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.

Fed. R. Evid. 702, Advisory Committee Notes.

14

### III.  Analysis

Plaintiff challenges several aspects of both expert opinions. Plaintiff argues that neither expert is qualified to give opinions on contract interpretation, Weisheit is not qualified to provide causation opinions, and Arnold is not qualified to offer opinions on unfair competition.  Plaintiff also objects to the relevance of both opinions, arguing that the potential unfair prejudice outweighs its probative value pursuant to Federal Rule of Evidence ("Rule") 403.

Additionally, Plaintiff's position is that Weisheit's opinion lacks reliability because he "did nothing to analyze and measure apportionment."[50]  With regard to the movies in addition to one based on The Maintenance Man, Plaintiff contends that Weisheit's testimony is speculative.  Arnold's opinion that the sales of video recordings had little impact on the opportunity for movie development is speculative, according to Plaintiff.  Plaintiff accuses Arnold of basing her opinions on "subjective interpretation as to what the witnesses knew, what their motivations were and what they were trying to convey."[51]  Arnold's reliance on general industry information, rather than a more tailored approach that considered only similar scripts, Plaintiff argues, led to a

---

[50]    Pl.'s First Am. Mot. to Exclude Testimony of Weisheit, Docket Entry No. 178, p. 7.

[51]    Pl.'s Mot. to Exclude Testimony of Arnold, Docket Entry No. 195, p. 9.

conclusion on the likelihood of the development of the movies that would not be helpful to a jury in this case.   Plaintiff finds Arnold's testimony on the development of additional movies to "ignore[] the factual realities of what was happening in the marketplace."[52]

Because Plaintiff does not challenge the general qualifications of the experts, the court need not address that issue in detail.   Suffice it to say that both experts have sufficient training and experience to qualify them as experts in their respective areas.   Weisheit has the necessary finance education and experience to offer opinions on damage calculation in cases such as this one, and Arnold has considerable experience in the film industry on which to base her opinions concerning film production and profits.

As Defendants point out, significant portions of both opinions and of Plaintiff's motions to exclude are now moot because the court found the parallel portions of Barnes' opinion to be unreliable and/or irrelevant.   Thus, Weisheit and Arnold's opinions regarding the likelihood that movies based on Men Cry in the Dark, The Maintenance Man sequel, God's Gift to Women, and Never Satisfied: How and Why Men Cheat would be made and their testimony regarding potential profits from those movies is excluded. Plaintiff's challenge of Arnold's assessment of net proceeds is

---

[52]   Id. at p. 14.

thus moot because Arnold responded to Barnes' opinions on net proceeds only for the above four additional potential movies that are no longer at issue.[53]

Plaintiff's Rule 403 argument appears to be a catchall in each motion. With regard to both experts, Plaintiff argues that, because their opinions are neither relevant nor reliable, they each pose the danger of unfair prejudice to Plaintiff. The court finds that Rule 702, rather than Rule 403, provides the proper analytical framework for assessing whether an expert's testimony is relevant and reliable and, thus, admissible.

The court addresses the remaining arguments as to each expert separately.

## A.   Exclusion of Weisheit's Testimony

Plaintiff is correct that the legal interpretation of contracts is a function of the court, not expert witnesses. Defendants contend that Weisheit offered no opinion on contract interpretation and that Plaintiff attempts to mislead the court by redacting large portions of Weisheit's deposition testimony.

Referring to the movie option contract for The Maintenance Man and related agreements, Weisheit stated in his report that Barnes performed the damage calculation based on the premise that Plaintiff was a party to those agreements when "a closer

---

[53]    Barnes estimated that the net proceeds for a movie based on The Maintenance Man would have been zero. Defs.' Second Sealed Expert App., Docket Entry No. 184, Sealed App. 1, Supplemental Expert Report of Barnes dated Dec. 24, 2009, p. 13.

examination" revealed that he was not.[54]  Plaintiff admitted and the court previously confirmed that Plaintiff was not a party to the option contract.[55]

A review of the contracts reveals: Farcor Baisden Partnership, LLC, and Behave Productions, Inc. entered into the Option and Acquisition of Rights contract; Farcor Baisden Partnership, LLC, and Stage 6 Films, Inc., entered into the Producer Agreement; and Michael Baisden Filmworks, LLC, Regan Jon, Inc., and Behave Productions, Inc., entered into the Writer's Agreement.[56]  Although the contracts contemplated that Plaintiff would play a role in the film development and he signed supporting documents, he clearly was not a party to the contracts.  As Weisheit's opinion is consistent with the court's interpretation of the contract on this point, it is admissible.

Plaintiff contends that Weisheit interpreted whether digital video recordings ("DVDs") were covered under the merchandising provisions of the Stageplay Agreements and how long those provisions were in force.  His opinions, according to Plaintiff,

---

[54]   Defs.' Second Sealed Expert App., Docket Entry No. 184, Sealed App. 116, Expert Report of Weisheit dated Feb. 15, 2010, p. 7.

[55]   See Mem. & Recommendation dated Sept. 9, 2009, Docket Entry No. 126, p. 40; Third Am. Compl. for Damages & Injunctive Relief, Docket Entry No. 153, p. 6, n.1.  "The Screen Gem entities did not contract with Baisden directly. Rather, they contracted with the Farcor Baisden Partnership, LLC."  Third Am. Compl. for Damages & Injunctive Relief, Docket Entry No. 153, p. 6, n.1.

[56]   Defs.' Second Sealed Expert App., Docket Entry No. 184, Sealed App. 217, Producer Agreement, Sealed App. 245, Option & Acquisition of Rights Contract, Sealed App. 287, Writer's Agreement.

are inconsistent with the court's summary judgment ruling.

In its September 2009 Memorandum and Recommendation, the court determined that DVDs were covered under each merchandising provision's inclusion of videos and that each provision remained in force until the end of the respective contract's three-year term unless IRP entered into a merchandising agreement with a third party prior to the expiration of the applicable contract, in which case the provision was in effect for the life of that third-party contract.[57]  Plaintiff does not point the court to specific parts of Weisheit's opinion that are inconsistent with the court's determination, and the court can find none.  Thus, the court finds it unnecessary to exclude Weisheit's testimony on this basis.

In calculating potential damages due Plaintiff based on these agreements, Weisheit stated, "Because the Agreements do not specify how writing and producing services are to be earned, an assumption is made that the individuals mentioned in the Agreements will earn fees equally."[58]  The court finds that this statement explains Weisheit's calculation method but does not offer an opinion on the proper interpretation of the contracts with regard to the division of fees for writing and producing services.  To the extent Weisheit's method is consistent with the ultimate findings of the

---

[57]     Mem. & Recommendation dated Sept. 9, 2009, Docket Entry No. 126, pp. 23-25.

[58]     Defs.' Second Sealed Expert App., Docket Entry No. 184, Sealed App. 116, Expert Report of Weisheit dated Feb. 15, 2010, p. 8.

court and jury, Weisheit's calculation of damages can be considered by the jury; to the extent the statement is inconsistent, Weisheit's calculation can be adjusted accordingly. The statement need not be excluded.

Plaintiff does not specify any other portion of the expert report that he believes demonstrates that Weisheit interpreted any contract provision material to this action. As indicated, contract interpretation is beyond the purview of an expert witness. However, the court is not moved at this time to make a ruling generally excluding portions of Weisheit's expert opinion on that basis.

Plaintiff also seeks to exclude Weisheit's testimony on causation because he was not designated as an expert on causation and is not qualified to offer causation testimony. As with legal interpretation, Defendants contend that Weisheit offered no such testimony.

Weisheit's report included the following opinions:

However, based on further Screen Gems testimony, it does not appear that Defendants caused the delay in developing one or more motion pictures, but rather the delay was caused by Mr. Baisden, Farcor Baisden, or entities or individuals acting on their behalf. . . . Based on the above Screen Gems' testimony, it does not appear that Defendants caused the delay in making the motion pictures, but rather the delay was caused by Mr. Baisden, Farcor Baisden, or entities or individuals acting on their behalf. As such, it appears the DELAY DAMAGES were caused by Mr. Baisden's own actions or failures to act

and not by those actions of the defendant.[59]

The court agrees with Plaintiff that Weisheit's opinion on what caused the delay is outside his area of stated expertise and should be excluded.

Plaintiff challenges Weisheit's apportionment of merchandise sales for purposes of determining copyright infringement damages, asserting that he did nothing to analyze and measure apportionment and that he has not been involved in a case where he was required to apply principles of apportionment.

Weisheit based his apportionment opinion on a provision in the Maintenance Man Agreement, which read:

> The Parties agree that Producer owns exclusive merchandising rights and agrees to compensate Author a forty percent (40%) share in net profits generated from merchandising sales (excluding novels written by Author) consummated at or in connection with the live performance of the Stageplay.  Such merchandise includes but is not limited to clothing, posters, programs, mugs, CDS or tapes, etc.  Producers shall purchase Author's books at their wholesale price.  This shall constitute Author's full compensation for books sold at live performances.  The Parties also agree that Producer shall be compensated a forty percent (40%) share of all net sales revenues generated by the sale of novels, videos, or any other works created by Author at or in connection with the live performance of the Stageplay.  This does not in any way entitle Producer to any other royalties received by Author from book and/or video sales not associated with the Stageplay.  Royalties or other proceeds generated by any future arrangement with any third party . . . to merchandise any character, likeness or other image or aspect of the live performance of the Stageplay or its production will also be split equally between Author and

---

[59]     Defs.' Second Sealed Expert App., Docket Entry No. 184, Sealed App. 116, Expert Report of Weisheit dated Feb. 15, 2010, pp. 5, 7.

Producer.  This Agreement on royalties or merchandising
proceeds extends for the life of any future third party
merchandise agreement associated with the Stageplay.[60]

Based on this provision, Weisheit concluded that the parties agreed
that forty percent represented the "relative value" or, in other
words, the "portion of profits from infringing sales that can be
ascribed to the intellectual property in question."[61]   Weisheit
applied forty-percent apportionment to merchandise sales related to
the Men Cry Stageplay as well, even though he acknowledged that the
merchandising provision of the Men Cry Agreement he reviewed had
been redacted to conceal the percentages of net sales to which
Plaintiff was entitled and did not mention the producer's purchase
price for books.

Based on Weisheit's experience assessing damages in
intellectual property cases, the court finds him qualified to offer
an opinion on the apportionment of merchandise sales.  Weisheit
explained how he reached his decision, and, although it may not be
the best method of determining relative value, it has a rational
foundation.  Any concern about his chosen method can be addressed
through cross-examination.

**B.   Exclusion of Arnold's Testimony**

The only specific instance of contract interpretation of which

---

[60]    Exs. to Defs.' Mot. for Partial Summ. J., Docket Entry No. 75, Tab
3, Maintenance Man Agreement, Section V.

[61]    Defs.' Second Sealed Expert App., Docket Entry No. 184, Sealed App.
116, Expert Report of Weisheit dated Feb. 15, 2010, p. 14 (quoting Daniel L.
Jackson, Calculating Intellectual Property Infringement Damages, 65 (2006).

Plaintiff accuses Arnold related to the option contract and whether it obligated Screen Gems to make films in addition to one based on The Maintenance Man.  Because the court has determined that none of the experts may testify on damages related to the additional movies, the point is moot.

The court agrees with Plaintiff that Arnold's job does not include determining whether Defendants unfairly competed against Plaintiff.  Defendants argue that Arnold rendered no opinion on unfair competition "in the sense suggested by Plaintiff."[62]

Arnold's opinion contains one statement related to this challenge:  "[T]he Unfair Competition by Misappropriation Claim does not appear to have foundation in the documents and materials that have been presented to me, but appears to be based on the use of Plaintiff's name, rather than the works themselves."[63]  Arnold is entitled to her opinion, but the jury will not benefit from her assessment of the evidence of unfair competition.  As it is outside her area of expertise, the statement should be excluded.

Plaintiff attacks Arnold's opinion that the presence of the Stageplay video recordings did not impede the development of a movie based on The Maintenance Man.  The court finds this testimony precisely within Arnold's range of experience.  She has worked many years in the film industry and based this opinion on that

---

[62]    Defs.' Resp. in Opp'n to Pl.'s Mot. to Exclude Testimony of Arnold, Docket Entry No. 200, p. 7.

[63]    Id. at Ex. A-1, Arnold's Expert Report, p. 2.

experience, as well as on independent research in the film industry and a comparison to Perry who sold millions of dollars worth of stageplay video recordings prior to the production of what have become successful movies.[64]  Arnold also noted that the sale of the video recordings was known to Screen Gems prior to the execution of the option contract, suggesting that Screen Gems did not believe those sales to be an impediment to film development.[65]

With regard to Arnold's review of the witness testimony, Plaintiff complains that she "misinterprets facts and simply tries to 'sum up' the testimony."[66]  Defendants respond that Arnold was entitled to review evidence and apply her expertise to those facts.

Without a doubt, an expert is expected to base her opinions on a review of the salient facts.  See Fed. R. Civ. P. 702; Smith, 495 F.3d at 227.  Plaintiff quotes four paragraphs of Arnold's report and, in conclusory fashion, states that they "are obviously based on Arnold's subjective interpretation as to what the witnesses knew, what their motivations were and what they were trying to convey."[67]  Nothing is so obvious to the court, and, absent a substantive explanation of Plaintiff's concern, the court finds Arnold's opinions based on the witness testimony to pass Rule 702

---

[64]    See id. at pp. 2, 6.

[65]    Id. at p. 6.

[66]    Pl.'s Mot. to Exclude Testimony of Arnold, Docket Entry No. 195, p. 8.

[67]    Id. at pp. 8-9.

standards.  Ultimately, the jury will weigh all witness testimony but is entitled to hear from Arnold and the other experts how the testimony provided the foundation for their opinions.

Plaintiff's final challenge, to Arnold's estimation that there was less than a twenty percent chance that a movie would have been completed based on The Maintenance Man even absent Defendants' alleged infringement, is based on Arnold's reliance on general industry information, which Plaintiff contends does not provide a sufficiently specific comparison.  Defendants argue that Arnold's analysis complied with standards in her field.

Arnold explained that studios complete and distribute only a small percentage of the film projects on which they acquire options, and many optioned projects never enter the first stage of development.[68]  The expert report states:

> During the period from January 2005-December 2009[,] 10,384 scripts were developed and 3,809 films were released during that same period.  Thus, only 36% of the total films developed were actually produced and distributed on either DVD or through a theatrical release.  And of those 36%, only 50% of those films were released theatrically, resulting in 18% of the total number of films developed during this 6[-]year period were released through a theatrical platform.[69]

Arnold concluded, based on those statistics that The Maintenance Man had a less-than-20 percent chance of receiving a theatrical distribution and possibly even less of a chance because the script

---

[68]    See Defs.' Resp. in Opp'n to Pl.'s Mot. to Exclude Testimony of Arnold, Docket Entry No. 200, Ex. A-1, Arnold's Expert Report, p.

[69]    Id. at pp. 9-10 9 (citing Baseline Systems, Apr. 6, 2010).

had not yet been developed.[70]

The above testimony is exactly the type of testimony that one would expect an expert in the film industry to provide.  Arnold is qualified by her experience to explain the inner workings of the industry, and her reliance on general statistical information does not diminish the value or helpfulness of her opinion.  Plaintiff can address his concerns regarding the application of general industry standards to this particular book through cross-examination.

## C.  <u>Summary of Testimony by Weisheit and Arnold to be Excluded</u>

All opinion testimony related to the four additional movies, including the likelihood that they would be developed and the projected profits is excluded.  Weisheit's opinion that Plaintiff, Farcor Baisden Partnership, LLC, or someone acting on their caused the delay in film development is excluded.  Arnold's opinion that Plaintiff's unfair competition claim has no basis in the evidence is excluded.

## IV.  Conclusion

Based on the foregoing, the court **GRANTS IN PART AND DENIES IN PART** Plaintiff's motions to exclude the testimony of Weisheit and Arnold as explained above.

---

[70]   <u>See</u> <u>id.</u> at p. 10.

**SIGNED** in Houston, Texas, this 22nd day of September, 2010.

Nancy K. Johnson
United States Magistrate Judge